UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Marilee S. Rowe,                                      Case No. 04-4492 (JNE/FLN)

        Plaintiff,

vs.                                                  **REPORT AND
                                                     RECOMMENDATION**

Jo Anne B. Barnhart,
Commissioner of
Social Security,

        Defendant.

_____

Fay E. Fishman, Esq., for Plaintiff.
Lonnie F. Bryan, Esq., for the Government.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on the

parties' cross-motions for summary judgment [##14 and 17]. Plaintiff Marilee S. Rowe("Ms. Rowe"

or "Plaintiff") seeks judicial review of the Commissioner of Social Security's final decision which

granted her a period of Disability Insurance Benefits ("DIB") from April 1, 2000, through November

30, 2001. See 42 U.S.C. §§ 416(I), 1381a, 1382c; (Tr. 14-28.) The Court has jurisdiction over this

matter pursuant to 42 U.S.C. §§ 405(g) and 1383©)(3). For the reasons which follow, the Court

recommends that Plaintiff's Motion be Granted and Defendant's Motion be Denied.

## I. INTRODUCTION

Plaintiff filed an application for Disability Insurance Benefits under the Social Security Act

on March 17, 2000, alleging disability commencing on August 16, 1998, due to injuries to her neck,

back and right shoulder. (Tr. 128-31, 145.) Plaintiff's application was denied initially and on

1

reconsideration.  (Tr. 107-09, 112-14.)  Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ").  (Tr. 115-16.)  A hearing was held before Administrative Law Judge Michael D.

Quayle on August 22, 2001.  (Tr. 274-313.)  On March 26, 2002, the ALJ issued a decision

awarding Plaintiff benefits for a period commencing April 1, 2000, and ending November 30, 2001.

(Tr. 28.)  Plaintiff appealed the unfavorable portion of the decision to the Appeals Council.  (Tr. 13.)

On May 10, 2003, the Appeals Council denied her request for review. (Tr. 7-10.)  The denial of

review made the ALJ's findings the final decision of the defendant.  42 U.S.C. § 405(g); Browning

v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981.

## II.  STATEMENT OF FACTS

### A.      Background

Plaintiff appeared and testified at the hearing, accompanied by her attorney and her husband.

(Tr. 35.)  Ms. Rowe was born on August 29, 1954, and was forty-seven years old when the ALJ

issued his decision regarding her disability benefits.  (Tr. 129.)  Ms. Rowe has a high school

education and a two year registered nursing degree.  (Tr. 151.)  Ms. Rowe has past relevant work

experience as a registered nurse, and at the time of the hearing possessed a current registered nursing

license.  (Tr. 39, 146.)  At the time of the hearing, Ms. Rowe was married and lived in a house along

with her youngest son and her daughter, her daughter's husband and their two children. (Tr. 6.)

### B.      Medical Evidence

In May of 1996, Ms. Rowe was involved in a motor vehicle accident and injured her neck

and right shoulder.  (Tr. 248.)  A magnetic resonance imaging ("MRI") study indicated a herniated

disc at the C4-5 level.  (Tr. 296.)  In July of 1996, Dr. Robert G. Jacoby ("Dr. Jacoby"), operated on

Ms. Rowe, performing a microdecompression and fusion at the C4-5 level.  (Tr. 235-37.)  In October

of 1996, she reported increased mid and lower thoracic pain extending to her flank.  (Tr. 242-43.)

In December of 1996, she reported that she was feeling poorly with recurring pain and paresthesias

in her right arm down into her fourth and fifth fingers of her hand and that her arm felt weak.  (Tr.

240-41.)

In January of 1997, Ms. Rowe stated that she continued to have difficulty with her right

shoulder.  (Tr. 308-09.)  An electromyography nerve conduction study was normal, but MRI testing

revealed possible rotator cuff impingement and tendinitis in her right shoulder.  (Tr. 261, 307, 309.)

Dr. Jacoby also noted that she could "probably try to go back to work, and that is her feeling as

well."  (Tr. 309.)   In February of 1997, Ms. Rowe complained to Dr. Paul R. Diekmann ("Dr.

Diekmann"), that she continued to have difficulty with her right shoulder.  (Tr. 258.)  In March of

1997, Ms. Rowe underwent arthroscopic decompression and rotator cuff debridement of her right

shoulder.  (Tr. 248-51.)  In April of 1997, she reported decreased pain and Dr. Diekmann noted that

she could work as long as she avoided overhead use of her right hand and lifting or carrying of 10

to 20 pounds.  (Tr. 253.)

In June of 1997, Dr. Diekmann noted that Ms. Rowe's pain had markedly decreased and that

her range of motion was improving steadily, but that her neck was still bothering her and she was

experiencing radiating pain into her forearm and hand.  (Tr. 252.)  That same month, she relayed

similar comments to Dr. Jacoby and also stated that she was "at wit's end" with respect to the

discomfort in her neck and back area.  (Tr. 303.)  Ms. Rowe informed Dr. Jacoby that she wanted

to go back to nursing, but did not think that she could.  (Tr. 300.)  She also stated that she slept in

a separate, firmer bed from her husband and that they had virtually no sex life due to her discomfort.

(Tr. 300.)  Dr. Jacoby noted that there was no good solution for her myoligamentous injuries which

were causing her to have headaches, neck pain, low back pain and some leg pain.  (Tr. 300-01.)  Dr. Jacoby did not believe depression was playing a role in her symptomatology.  (Tr. 301.)

In July of 1997, Dr. Jacoby opined that Ms. Rowe had sustained a permanent injury as a result of the motor vehicle accident and that she was limited with respect to lifting, bending and twisting of the neck, as well as her right shoulder.  (Tr. 298.)  Dr. Jacoby also opined that she should not do overhead work, maneuvers where she had to do prolonged flexion of the neck or extension of the neck, and that she should avoid lifting more than 25-30 pounds.  (Tr. 298.)  Dr. Jacoby expressed his concern, in the context of her possibly returning to nursing, that if she were required to assist a patient if they were to stumble or fall, she could seriously reinjure her shoulder and neck area.  (Tr. 298.)  In August of 1997, Ms. Rowe was examined at a pain clinic, where it was recommended that she participate in physical therapy prior to a pain management program.  (Tr. 262-65.)

Throughout the remainder of 1997, Ms. Rowe continued to be seen by Dr. Jacoby, receiving care including chiropractic, physical therapy and medication.  (Tr. 280-93.)  In September of 1997, Dr. Jacoby noted that Ms. Rowe wanted to try to go back to work.  (Tr. 292.)  In October of 1997, Dr. Jacoby planned to have her return to work a couple of days per week as a form of physical therapy, and it was noted later that she volunteered about two hours per week at a women's clinic. (Tr. 286, 293.)  She continued to complain of headaches, neck pain, right arm pain, and thoracic pain, but Dr. Jacoby reported normal neurological findings.  (Tr. 282, 290, 292, 300.)

In March of 1998, Ms. Rowe began working at the Anoka County Jail, where she passed out medications, pushed a cart and did some overhead work.  (Tr. 277.)  She generally worked two eight hour days a week, but tried not to work her shifts back-to-back.  (Tr. 277.)  Ms. Rowe informed Dr.

Jacoby that pain in her neck, right shoulder and right arm had flared up.  (Tr. 277.)  In May of 1998, she reported that she was stable and feeling fairly decent.  (Tr. 273.)  She informed Dr. Jacoby that she was still working part-time, but no more than two shifts in a row.  (Tr. 273.)

In July of 1998, Ms. Rowe complained to Dr. Jacoby that she continued to have difficulty with neck pain and headaches as well as arm pain bilaterally.  (Tr. 270.)  She reported that she was still working at the Anoka County Jail, but no more than three days a week.  (Tr. 270.)  She reported that she liked her job.  (Tr. 270.)  Ms. Rowe stated that sometimes she experienced significant flareups, but was not quite sure as to the cause.  (Tr. 270.)

Ms. Rowe next saw Dr. Jacoby on October 22, 1998, complaining of increasing neck pain, arm pain and shoulder pain.  (Tr. 268.)  She reported that she stopped working at the Anoka County Jail because she became unable to do her job with the flareups, stating that both she and her employer decided it was in the best interest for her to discontinue work.  (Tr. 268.)  Ms. Rowe stated that she had difficulties with use of her right arm, noting that it was numb and tingly.  (Tr. 268.)  Dr. Jacoby observed that Ms. Rowe exhibited a reduced range of motion in her neck and pain behavior in response to palpation, but noted otherwise unremarkable findings.  (Tr. 268.)  Dr. Jacoby concluded that Ms. Rowe was "not doing very well[,]" and prescribed a "burst and taper of Dexamethasone."[1]  (Tr. 268.)  Dr. Jacoby noted that if she did well on the Dexamethasone he would schedule a functional capacity evaluation to see what Ms. Rowe could and could not do to try and get her back to gainful employment.  (Tr. 268.)

Ms. Rowe followed up with Dr. Jacoby on December 16, 1998, reporting that the

---

[1] Dexamethasone is a synthetic analog to naturally occurring glucocortoid steroids hydrocortisone and cortisone.  PHYSICIANS' DESK REFERENCE 1965 (5th Ed. 2003). Dexamethasone is primarily used for its potent anti-inflammatory effects.  Id.

Dexamethasone was beneficial and allowed her "to get out of the rut she was in." (Tr. 266.) Nonetheless, she continued to complain of difficulties with neck pain and headaches, as well as bilateral arm pain and low back pain. (Tr. 266.) Ms. Rowe indicated that she was exercising and that she had lost weight. (T. 266.) On exam, Dr. Jacoby observed decreased range of motion in her neck and tightness in her neck muscles. (Tr. 266.) He indicated that she should continue with her medications and exercise. (Tr. 267.)

On March 17, 1999, Dr. Jacoby noted that on February 25, 1999, Ms. Rowe was involved in another motor vehicle accident in which a school bus hit her driver's side door. (Tr. 441.) She complained of increasing neck pain, headaches and upper back pain since the accident, as well as significant difficulty sleeping due to her neck and shoulder pain. (Tr. 441.) Ms. Rowe stated that she felt she was slowly getting better, almost close to her baseline prior to the accident, but that she was having more triggers and flareups than in the past. (Tr. 441.) Dr. Jacoby observed a decreased range of motion and tightness in her cervical and thoracic paraspinal muscles. (Tr. 441.) He recommended that she continue with her exercises and also that she attend physical therapy three times a week for four weeks. (Tr. 442.) Dr. Jacoby also prescribed Celebrex. (Tr. 442.)

Ms. Rowe next saw Dr. Jacoby on April 28, 1999, reporting that her headaches were better and that her pain had returned to baseline. (Tr. 439.) She informed Dr. Jacoby that she was not working, but that she was submitting applications regularly. (Tr. 439.) Dr. Jacoby noted that Ms. Rowe had attended physical therapy five or six times, but that it seemed to aggravate her symptoms and she stopped going. (Tr. 439.) Dr. Jacoby also noted her frustration that she could not participate in physical activities that she had been able to do. (Tr. 439.) On exam, he observed no acute distress, but spasm and tenderness over her trapezius muscles bilaterally with the right greater than

the left.  (Tr. 439.)  He also noted mild spasm and tenderness of the paraspinous cervical muscles, a limited range of motion of the cervical spine and give away weakness in her right deltoid muscle due to pain. (Tr. 439.)  Dr. Jacoby recommended that Ms. Rowe continue with her home exercises and that she continue her Celebrex prescription.  (Tr. 440.)

On June 16, 1999, Ms. Rowe informed Dr. Jacoby that she was back to her baseline condition prior to the accident in February of 1999.  (Tr. 436.)  Ms. Rowe also reported continued difficulty with headaches, neck pain and low back pain, stating that nothing seemed to help her. (Tr. 436.)  She described her headaches as "whole cranium in nature with a significant neck component." (Tr. 436.)  She again expressed her frustration at not being able to do what she wanted to do.  (Tr. 436.)  On exam, Dr. Jacoby noted that Ms. Rowe's neck was supple with a full range of motion.  (Tr. 436.)  He noted that he had little else to offer Ms. Rowe and recommended that she continue with her exercise and her medications.  (Tr. 437.)

In August of 1999, after Ms. Rowe complained of right-sided abdominal pain, an ultrasound revealed a large uterine myoma with prominent endometrial stripes to the upper limits of normal. (Tr. 314.)  On September 15, 1999, Ms. Rowe underwent a total vaginal hysterectomy and bilateral salpingo-oophorectomy, tolerating the procedure well.  (Tr. 316-17.)   She was discharged on September 17, 1999.  (Tr. 316.)

On October 14, 1999, Ms. Rowe returned to Dr. Jacoby for a regularly scheduled follow-up, continuing to complain of headaches, neck pain and low back pain.  (Tr. 433.)  She informed Dr. Jacoby that she had changed her attitude and was trying to adapt.  (Tr. 433.)  She reported losing 22 pounds on a diet, and that she was engaged in more activities such as walking.  (Tr. 433.)  She also reported trying to do some painting, but that it caused neck and shoulder pain bilaterally.  (Tr. 433.)

Dr. Jacoby noted that her examination was unremarkable with a supple neck and full range of motion. (Tr. 434.) Dr. Jacoby encouraged Ms. Rowe to continue her diet and exercise. (Tr. 434.)

On December 21, 1999, Ms. Rowe was seen by a nurse practitioner at Dr. Jacoby's office for complaints of a flareup after holding her granddaughter. (Tr. 428.) Ms. Rowe complained of severe pain affecting her sleep. (Tr. 428.) She reported waking with a headache which would worsen as the day progressed, along with muscle spasms on both sides of her neck throughout the day. (Tr. 428.) She also reported right arm pain going down into her thumb. (Tr. 428.) On exam, it was noted that Ms. Rowe exhibited a limited range of motion of her neck in all directions along with extreme tenderness to palpation of the paracervical, trapezius and parathoracic muscles bilaterally. (Tr. 429.)

On April 7, 2000, Ms. Rowe was again seen by a nurse practitioner at Dr. Jacoby's office. (Tr. 424.) Ms. Rowe reported ongoing complaints of right neck and shoulder pain radiating into her right arm, and stated that she was unable to lift her four-month old granddaughter due to pain. (Tr. 424.) She expressed anger at what she viewed as limited options for work and stated that she was unable to do anything in which her arms were held out in front of her, such as typing. (Tr. 424.) On examination, it was noted that cervical range of motion was decreased in all planes along with tenderness of the paracervical and thoracic paraspinal muscles. (Tr. 425.) It was suggested that Ms. Rowe consider seeing a counselor to talk about her frustration with her trauma and situation. (Tr. 426.) It was also recommended that a functional capacity evaluation be obtained in order to evaluate her job capabilities. (Tr. 426.)

On April 10, 2000, Ms. Rowe had a mole removed from her back which had been changing and getting larger. (Tr. 347.) Upon testing, it was determined that the excised specimen was

melanoma, and it was recommended that a lymph node biopsy be obtained.  (Tr. 336.)  On May 5, 2000, Ms. Rowe underwent wide local excision of the melanoma and sentinel lymph node exploration.  (Tr. 334.)  On May 8, 2000, it was noted that there was no evidence of residual malignancy at the site of the excision, but that one of the sentinel lymph nodes was positive for micro metastatic melanoma and the second one contained a single positive cell.  (Tr. 333.)  It was recommended that Ms. Rowe undergo further surgery with a postoperative consultation to consider chemotherapy.  (Tr. 333.)  On May 14, 2000, Ms. Rowe underwent formal axillary dissection.  (Tr. 361-62.)  In total, twelve new lymph nodes were found all of which were negative for malignancy.  (Tr. 331.)  Dr. Alan Johnson, who conducted the postoperative examination, noted his concern of possible wound infection.  (Tr. 331.)

On June 14, 2000, Ms. Rowe met with Dr. Thomas T. Amatruda ("Dr. Amatruda"), in order to review treatment options related to the melanoma.  (Tr. 390.)  Dr. Amatruda recommended that she take Interferon for one year in order to reduce her recurrence risk from an estimated 50% to about 15% at five years.  (Tr. 389-90.)  After being informed of the side effects,[2] Ms. Rowe agreed to Interferon treatment.  (Tr. 389.)  On follow-up three weeks later, Dr. Amatruda noted that Ms. Rowe was not pleased with the treatment but was doing pretty well.  (Tr. 386.)  He observed that her mood was "one of gallows humor and fatal acceptance which may be the best way to get through an Interferon treatment course."  (Tr. 386.)

On September 21, 2000, Ms. Rowe returned to Dr. Jacoby's office, complaining of worsening headaches, neck pain and back pain.  (Tr. 416.)  On exam it was observed that she was

---

[2] Common side effects, as described by Dr. Amatruda, include fatigue, depression, anorexia, low grade fevers and chills.  (Tr. 389.)  Some patients experience nausea and headaches.  (Tr. 389.)

tender over the cervical spine, paraspinal muscles and trapezius muscles with spasm, with the right side greater than the left.  (Tr. 416.)  It was also noted that her range of motion showed moderate limitation and that she exhibited some give away weakness in her right deltoid muscle.  (Tr.  416.)  It was recommended that Ms. Rowe try physical therapy.  (Tr. 417.)

On October 19, 2000, Ms. Rowe saw Dr. Jacoby, complaining of significant difficulties with headache, neck pain and shoulder pain due to her prior accidents.  (Tr. 412.)  Dr. Jacoby noted that her major problem at the time was her Interferon treatment.  (Tr. 412.)  Dr. Jacoby recommended that Ms. Rowe continue with her current regimen.  (Tr. 413.)  In addition, he ordered an MRI of her cervical/thoracic spine due to concern about possible metastasis or possible cervical lesions.  (Tr. 413.)  On October 23, 2000, Dr. Jacoby reviewed the results of the MRI which revealed mild posterior bulging and marginal spurring at the C5-6 level, but no evidence of acute disc herniation or spinal stenosis.  (Tr. 410-11.)  Dr. Jacoby noted mild thoracic spondylosis with degenerative changes in the lower thoracic spine.  (Tr. 409.)

On December 28, 2000, Dr. William J. Kane ("Dr. Kane"), conducted an independent orthopedic consultation as part of litigation involving the 1996 motor vehicle accident. (Tr. 375-78.) Ms. Rowe informed Dr. Kane that she experienced continued discomfort in her upper back, neck pain with spasms and headaches.  (Tr. 376.)  Dr. Kane reviewed her medical records and conducted an exam.  (Tr. 377.)  On exam, Dr. Kane noted that Ms. Rowe's range of motion of her cervical spine was markedly diminished, but that the range of motion in her shoulders was within normal limits.  (Tr. 377.)  Ms. Rowe also exhibited tenderness across the upper right shoulder region and along the para-scapula musculature.  (Tr. 377.)  Dr. Kane opined that Ms. Rowe's medical treatment following the accident was efficacious, although he noted that he did not believe that she would

return to regular work as a registered nurse. (Tr. 378.) Dr. Kane also opined that Ms. Rowe would not need future medical care or treatment attributable to the 1996 accident. (Tr. 378.)

On January 17, 2001, Ms. Rowe followed up with Dr. Amatruda, who noted that the Interferon treatment had further hampered her ability to work. (Tr. 379.) Dr. Amatruda noted that Ms. Rowe had recovered well from the initial period of severe side affects, but that she still had significant symptoms of fatigue and episodic bronchitis. (Tr. 379.) He also noted that many patients on Interferon treatment were able to work part time, and he generally recommended that patients try starting with 50% time and increasing as tolerated. (Tr. 379.) Dr. Amatruda's exam revealed no further signs or symptoms of melanoma recurrence. (Tr. 379.)

On March 27, 2001, Ms. Rowe returned to Dr. Jacoby, complaining of neck and arm pain which she characterized as extremely intense and severe. (Tr. 406.) Ms. Rowe stated that she was experiencing tightness in her neck, shoulders, arm and low back, and that bending, lifting, twisting and using her hands in an outstretched manner bothered her. (Tr. 406.) Ms. Rowe stated that she felt worn down and that she was trying to continue her exercises but that fatigue was limiting her ability to function. (Tr. 406.) Dr. Jacoby opined that she was doing about the same, but that the Interferon treatment was increasing her fatigue and underlying muscle aches. (Tr. 407.)

On July 6, 2001, Ms. Rowe saw Dr. Cynthia Vehe ("Dr. Vehe"), at the request of Dr. Amatruda for a skin examination. (Tr. 479.) Dr. Vehe noted that there were no palpable lymph nodes and that lesions in her left inguinal area appeared benign. (Tr. 479.) Dr. Vehe recommended that Ms. Rowe obtain regular full body examinations. (Tr. 479.) On August 8, 2001, she was seen by Dr. Amatruda on follow up. (Tr. 460.) Ms. Rowe reported a gradual improvement in energy since completing her Interferon treatment, and Dr. Amatruda noted that her spirits were good and

11

that she had put on some weight.  (Tr. 460.)  Dr. Amatruda noted no sign of melanoma recurrence.

(Tr. 460.)

On August 13, 2001, Dr. Jacoby completed a residual functional capacity ("RFC")

questionnaire.  (Tr. 500-05.)  Dr. Jacoby noted that he had treated Ms. Rowe for four years.  (Tr.

500.)  Dr. Jacoby opined that Ms. Rowe's pain was severe enough to often interfere with her

attention and concentration and that she experienced sedation and dizziness from her prescription

of Nortriptyline; that Ms. Rowe was limited to sitting for 2 hours of an 8 hour day, must be able to

change positions at will, and over the course of a normal work day would need to take unscheduled

15-minute breaks every 1 to 2 hours.  (Tr. 501-03.)  Dr. Jacoby also opined that Ms. Rowe was

limited to lifting less than 10 pounds only occasionally, and that she had significant limitations in

doing repetitive reaching, handling or fingering.  (Tr. 503-04.)  Dr. Jacoby marked that Ms. Rowe

was likely to experience good days and bad days and that she was likely to be absent from work as

a result of her impairments more than four times per month.  (Tr. 504.)

### C.    Plaintiff's Testimony

Ms. Rowe testified that she stopped working in August of 1998, due to headaches, upper

back pain, and numbness in her right arm which resulted from a motor vehicle accident in 1996.  (Tr.

45-47, 49.)  She stated, at the time of the hearing, that she was unable to "do repetitive head things

and if I keep my head down or back too long, it sticks . . . and I have to move it, which really is

difficult and I have a big click." (Tr. 51.)  Ms. Rowe testified that because of the problems with her

upper back and right arm she tended to drop things, giving the example of dropping her

granddaughter.  (Tr. 52.)

Ms. Rowe testified that not a day went by without pain, but on a good day she was able to

get up and take a shower without feeling miserable.  (Tr. 52.)  On a better day she was able to get

out and walk, cook occasionally, and do grocery shopping with her husband or daughter, but tasks

such as laundry and vacuuming were difficult due to the repetitive bending and moving of her arm.

(Tr. 55-56.)  She estimated that she was able to be active for 10 to 15 minutes before she had to stop

and move or stretch.  (Tr. 57.)  Ms. Rowe stated that on a bad day her right arm was very weak and

that it became difficult to use it.  (Tr. 60.)  She described her muscles as being very tight.  (Tr. 60.)

Ms. Rowe testified that she would not do anything.  (Tr. 61.)

She stated that in November of 1999, she traveled with her husband to London to visit his

parents.  (Tr. 58.)  Ms. Rowe testified that she was not able to do much in the way of sightseeing

because riding in a car was very difficult.  (Tr. 59.)  She stated that the plane flight to London was

not very bad, but that the flight back was awful and that a sympathetic flight attendant moved her

to first class to give her more room.  (Tr. 59-60.)

Ms. Rowe testified that although her energy had improved since completing her Interferon

treatment, she felt as if her neck, back and arm problems had become worse in the four to five

months prior to the hearing.  (Tr. 63.)  On a better day, she tried to read and was trying to keep up

her nursing license.  (Tr. 64.)  She also tried to do some cooking, housework and outdoor activities,

but that she would end up sore.  (Tr. 64-65.)  She testified that on a bad day she would cry from the

pain.  (Tr. 65.)

### D.    Plaintiff's Husband's Testimony

Ms. Rowe's husband, John Rowe ("Mr. Rowe"), testified as to the changes which occurred

after his wife's motor vehicle accident in 1996, stating that before the accident she was very active

and that she worked full time, did the housework, and engaged in a number of outside activities.

13

(Tr. 91-92.)  Following the accident, Mr. Rowe testified that his wife was able to engage in little, if any, of her former activity, although she would try and would end up having "a bad day afterwards."  (Tr. 92-93.)  Mr. Rowe specifically noted that his wife was unable to do such tasks as laundry, vacuuming, cooking, cleaning, and stated that their daughter moved in with them in order to help out with such tasks.  (Tr. 93-94.)  Mr. Rowe testified that his wife's abilities not improved over time and that she experienced a greater frequency of bad days, between two and four per week, at the time of the hearing.  (Tr. 97.)

### E.   Medical Expert's Testimony

Dr. Katherine Hiduchenko ("Dr. Hiduchenko") testified as a medical expert at the hearing. (Tr. 69.)  Dr. Hiduchenko first testified as to Plaintiff's skin cancer, opining that Plaintiff did not meet the listing requirements for malignant melanoma[3] because there was no evidence of any spread, residual tumor or metastases.  (Tr. 76.)  Dr. Hiduchenko stated, however, that side effects from the interferon treatment were severe enough that they would have to be considered equal to listing level severity from April of 2000, to November of 2001.  (Tr. 76.)

Dr. Hiduchenko next testified as to Plaintiff's complaints of chronic pain noting Plaintiff's surgeries and opining that they produced generally positive results.  (Tr. 77.)  Dr. Hiduchenko stated that Plaintiff's complaints of right arm weakness were not well documented.  (Tr. 78.)  Dr. Hiduchenko opined that Plaintiff did not meet any listing criteria for any vertebrogenic disorder or arthritis.[4]  (Tr. 79.)  Dr. Hiduchenko stated that Plaintiff's primary limitation, outside of the side effects from the interferon treatment, would be due to pain rather than any neurological problem.

---

[3] 20 C.F.R. Part 404, Subpt. P, App. 1, § 13.05.

[4] Id., §§ 1.04 and 1.05.

14

(Tr. 81.) Dr. Hiduchenko opined that Plaintiff should be restricted with respect to repetitive motion and overhead work involving her right arm, and that she should not lift more than ten pounds. (Tr. 80-81.)

### F.    Vocational Expert's Testimony

Robert Brezinski ("Mr. Brezinski") testified as a vocational expert at the hearing. (Tr. 82.) The ALJ asked Mr. Brezinski to consider an individual who had a sedentary residual functional capacity of Plaintiff's age, educational background and work history experience. (Tr. 83.) The hypothetical individual would need to avoid repetitive work with her right arm, particularly repetitive, overhead work, and would need to avoid having her head in a static position such as staring at a computer screen all day. (Tr. 83.) Mr. Brezinski asked whether the hypothetical individual would be able to perform repetitive work at waist level, to which the ALJ replied in the affirmative. (Tr. 84.) Based on the hypothetical presented, Mr. Breszinski testified that such an individual would not be able to perform Plaintiff's past relevant work. (Tr. 84.)

The ALJ then asked if the hypothetical individual would be able to perform any other work. (Tr. 84-85.) Mr. Brezinski testified that the hypothetical individual would be able to perform other work, identifying approximately 4,000 to 5,000 order clerk positions; 3,000 telephone answering service positions; and 10,000 receptionist positions. (Tr. 85.) The ALJ then asked Mr. Brezinski to consider a hypothetical individual with limitations consistent with Dr. Jacoby's RFC evaluation of August 13, 2001. (Tr. 86-87, 500-05.) Mr. Brezinski testified that an individual with such limitations would not be able to perform competitive employment. (Tr. 88.)

### G.    The ALJ's Decision

In evaluating Plaintiff's claim of disability, the ALJ followed the five-step sequential process

outlined at 20 C.F.R. § 404.1520.  At the first step in the process, the ALJ evaluated whether the Plaintiff engaged in substantial gainful activity since the date of alleged onset of disability and concluded that Ms. Rowe had not engaged in substantial gainful activity after the alleged onset date. (Tr. 19.)

At the second step in the sequential evaluation, the ALJ determined whether or not the Plaintiff had a "severe" impairment, which is defined as an impairment which imposes more than a minimal effect on Ms. Rowe's physical or mental ability to perform basic work-related activities. 20 C.F.R. § 404.1521.  The ALJ first noted that Ms. Rowe complained of feeling depressed since the motor vehicle accident of 1996, but found that the medical evidence did not support a medically determinable severe impairment.   (Tr. 19.)   The ALJ then turned to Ms. Rowe's physical impairments, finding that she has severe impairments of status post cervical decompression and fusion in 1996; status post right shoulder arthroscopic subacromial decompression and rotator cuff debridement in 1997; myofascial cervical spine and right shoulder pain; tension headaches; status post melanoma in remission with surgical resection and Interferon therapy. (Tr. 19.) After finding that Ms. Rowe's impairments were "severe," the ALJ turned to step three to determine whether her impairments met, medically equaled, or were functionally equivalent to any impairments contained in the Listing of Impairments, Appendix 1 to Subpart P, Regulations No. 4.  20 C.F.R. § 1520(d); (Tr. 19.)

Based on a review of the record evidence and the opinion of Dr. Hiduchenko, the ALJ found that Ms. Rowe's melanoma equaled the criteria of listing 13.05 from April 1, 2000, through November 30, 2000.  (Tr. 19.)  The ALJ then considered whether Ms. Rowe's other impairments met or equaled listing level severity for the periods of August 16, 1998, to March 31, 2000, and

since December 1, 2001.  (Tr.19-20.)  The ALJ detailed her medical history, and considered her subjective complaints pursuant to the analysis set forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984).  (Tr. 20-25.)  The ALJ found that Ms. Rowe's allegations of disabling pain and limitations were not consistent with the objective medical record.  (Tr. 20.)

In reaching his conclusion, the ALJ noted Ms. Rowe's back and shoulder surgeries in 1996 and 1997, as well as her ongoing treatment with Dr. Jacoby.  (Tr. 21-25.)  The ALJ acknowledged Dr. Jacoby's RFC completed in August of 2001 but did not give it controlling weight, finding that it was not supported by objective findings on examination.  (Tr. 25.)  The ALJ noted that Ms. Rowe had exhibited reduced range of motion, but that she had generally maintained normal sensation, strength, and use of her upper extremities.  (Tr. 25.)  The ALJ noted that her lumbar spine complaints were not supported by physical or neurological examination.  (Tr. 25.)  The ALJ found it significant that Dr. Jacoby had released Ms. Rowe to work at one point, and noted that there was some question as to whether Ms. Rowe had self-limited her activities.  (Tr. 25.)  The ALJ also noted that Ms. Rowe had not fully participated in treatment recommendations and that her failure to seek aggressive medical treatment discredited her assertions of disabling pain.  (Tr. 25.)

The ALJ considered Ms. Rowe's testimony, and that of her husband, with respect to her ability to engage in daily life.  (Tr. 25-26.)  The ALJ noted that Plaintiff testified that she occasionally cooked, shopped with assistance and engaged in 10 to 15 minute increments of activity.  (Tr. 25.)  The ALJ noted the claim that Ms. Rowe's daughter had moved in with them to assist Ms. Rowe, but found that Ms. Rowe provided childcare for her granddaughter while her daughter was on bedrest during pregnancy.  (Tr. 25-26.)  The ALJ also noted that Ms. Rowe had traveled to London in 1999.  (Tr. 26.)

The ALJ turned to the fourth step, determining Ms. Rowe's RFC and whether it allowed her to perform any of her past relevant work.  20 C.F.R. § 404.1520(e); (Tr. 25-26.)  The ALJ credited the testimony of Dr. Hiduchenko with respect to Ms. Rowe's functional capacity, finding that she retained the RFC to perform work with the following restrictions: lifting and carrying 10 pounds occasionally; standing and/or walking 2 hours of an 8 hour day; sitting 6 hours of an 8 hour day; avoiding repetitive overhead motions with her right arm; and avoiding static head positioning.  (Tr. 25.)  Based on the testimony of Mr. Brezinski, the ALJ found that Ms. Rowe would not be able to perform her past relevant work.  (Tr. 26.)

The ALJ thus turned to the fifth step of the sequential evaluation, determining whether there were a significant number of other jobs existing in the national economy which Ms. Rowe would be able to perform (Tr. 26.)  Based on the testimony of Mr. Brezinksi, the ALJ found that she would able to perform the jobs of order clerk, telephone answerer and receptionist.  (Tr. 26.)  The ALJ concluded that Ms. Rowe was not under a disability as defined in the Social Security Act for the periods of August 16, 1998, to March 31, 2000; and from December 1, 2001.  (Tr. 27.)

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989).  Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jackson v. Apfel, 162 F.3d 533, 536 (8th Cir. 1998); Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998).  In determining whether the Commissioner's decision is

supported by substantial evidence on the record as a whole, the Court must evaluate all of the evidence in the record including searching for both substantial evidence supporting the Commissioner's findings and taking into account evidence that detracts from the decision.  Brand v. Sec. of Dept. of Health, etc., 623 F.2d 523, 527 (8th Cir. 1980).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999);  Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (internal citations omitted); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).  The Court may reverse the Commissioner's decision if the evidence compels reversal, not merely because the evidence supports a contrary decision.  Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992).

In social security cases, the reviewing courts are generally guided by the following factors:

a.   Findings of credibility made by the ALJ;
b.   Education, work history and age of the claimant;
c.   Medical evidence given by the claimant's treating physicians;
d.   Subjective complaints of pain and description of claimant's physical activity and impairments;
e.   Corroboration by third parties of claimant's impairments;
f.   Vocational testimony based on proper hypothetical questions fairly setting forth the impairments; and
g.   Testimony of consulting physicians.

Brand, at 527.

## IV.  CONCLUSIONS OF LAW

In moving for summary judgment, Ms. Rowe's argues that: 1) the ALJ failed to accord proper weight to the RFC evaluation of Dr. Jacoby; 2) the ALJ improperly discredited her subjective

complaints of disability; 3) the ALJ erred in dismissing her allegation of depression without further evaluation;[5] and 4) the ALJ failed to propound a proper hypothetical to the Vocation Expert.  Ms. Rowe requests that the Court reverse the determination of the Commissioner and enter judgment on her behalf, or, in the alternative, remand the matter to the be evaluated under the proper standards.

A.      **The ALJ Failed To Properly Evaluate Dr. Jacoby's Opinion As The Treating Physician.**

The RFC is what a claimant can do despite their limitations, and it must be determined on the basis of all relevant evidence, including medical records, physicians' opinions, and the claimant's descriptions of his or her limitations.  See 20 C.F.R. § 404.1545(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).  A treating physician's RFC opinion is entitled to great weight if it is well supported by medically acceptable techniques and is not inconsistent with the other substantial evidence in the record.  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).  The treating physician's opinion should not ordinarily be disregarded.  Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991). The ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence or if the treating physician has offered an inconsistent opinion.  Hogan, 239 F.3d at 961.  An ALJ may also discount a treating physician's medical opinion when the treating source's statements are conclusory or unsupported by medically acceptable clinical or diagnostic data.  Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996)   A consulting physician's opinion generally does not constitute substantial evidence when the physician has examined the claimant only once, or not at all.  Kelley v. Callahan, 133 F.3d

---

[5] The Court finds this contention to be without merit.  Ms. Rowe's bears the burden in the first instance of providing evidence supporting a contention of impairment and she essentially concedes that the record is devoid of any evidence supporting a finding of depression.  Based on a review of the record, the Court agrees with the ALJ's determination in this respect.

583, 589 (8th Cir. 1998); <u>Shontos v. Barnhart</u>, 322 F.3d 532, 540-41 (8th Cir. 2003).

When weighing a medical opinion, the ALJ should consider: 1) the examining relationship; 2) the treatment relationship; 3) whether medical findings support the opinion; 4) whether the opinion is consistent with the record as a whole; and 5) whether the physician is a specialist.  20 C.F.R. § 404.1527(d)(1)-(5); <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 694 (8th Cir. 2003).  It is not, however, the law in the Eighth Circuit that the ALJ must consider each factor in deciding how much weight to accord a medical opinion, but rather the ALJ "should 'give good reasons' for discounting a treating physician's opinion."  <u>Dolph v. Barnhart</u>, 308 F.3d 876, 878-79 (8th Cir. 2003) (quoting <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1013 (8th Cir. 2000), <u>reh'g</u> and <u>reh'g en banc denied</u>, April 26, 2000); <u>cf.</u> <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each <u>Polaski</u> consideration, so long as he acknowledged and examined those considerations).

In this case, Ms. Rowe contends that the ALJ failed to properly explain why he failed to give weight to the RFC evaluation of Dr. Jacoby.  The ALJ  rejected Dr. Jacoby's August, 2001 opinion because:

> such a restrictive functional capacity is not supported by the objective findings on examination.  While this claimant has shown some decreased range of cervical spine and shoulder motion, she has generally maintained normal sensation, strength and use of her upper extremities.  Her lumbar spine complaints were not fully supported by physical or neurologic examination.  Dr. Jacoby even released the claimant to work as a form of therapy at one point.

(Tr. 25.) Ms. Rowe argues that the ALJ's analysis is conclusory and misleading.  She acknowledges that Dr. Jacoby did release her to work, but that it was in October of 1997, nearly a year prior to her alleged onset of disability.  She also characterizes as conclusory the ALJ's conclusion that Dr. Jacoby's opinion was not supported by objective medical evidence, and questions what further

evidence would be required.  In response, the Commissioner primarily points to the general findings of normal neurological functioning as supporting the ALJ's determination, and characterizes Dr. Jacoby's examinations as presenting minimal objective evidence in support of disability.  In reply, Ms. Rowe asserts that there is no authority for the position that adverse neurological findings are required for a determination of disability.

The Court agrees with Plaintiff that the ALJ's analysis of Dr. Jacoby's opinion falls short of the required considerations.  There is no indication that the ALJ gave any consideration to the longitudinal perspective and the character of Dr. Jacoby's treatment relationship with Ms. Rowe.  Prior to completing his RFC evaluation, Dr. Jacoby had regularly examined and treated Ms. Rowe for four years.  (Tr. 500.)  The evidence of record reveals no other medical source which had a more detailed and expansive knowledge and understanding of Ms. Rowe's complaints of neck, shoulder and back pain than Dr. Jacoby.

The ALJ's conclusion that Dr. Jacoby's opinion was inconsistent with objective findings is also flawed.  The ALJ pointed to generally normal neurological findings as contradicting Dr. Jacoby's opinion, but gives no further authority or explanation for such a position.  In particular, the ALJ notes, "While the claimant has shown some decreased range of cervical spine and shoulder motion, she has generally maintained normal sensation, strength and use of her upper extremities."  Dr. Jacoby stated that he was basing his opinion on MRI scans and the fusion at C4-5.  (Tr. 500.)  The ALJ acknowledges that throughout his treatment relationship with Ms. Rowe, Dr. Jacoby observed limitations in her range of motion, but minimizes the findings by pointing to Ms. Rowe's general retention of normal sensation, strength and use of her upper extremities.  The ALJ fails to explain how, if at all, these other objective findings are inconsistent with Dr. Jocoby's opinion.

22

The ALJ also points to the fact that Dr. Jacoby released Ms. Rowe for work, a fact which is misleading at best.  As noted by Ms. Rowe, Dr. Jacoby's work release occurred in October of 1997, nearly a year prior to her alleged onset date.  Dr. Jacoby noted that Ms. Rowe wanted to try to work, and planned for her to work a couple of days a week as a form of physical therapy.  (Tr. 290, 292.) Ms. Rowe did return to work, at first volunteering part-time at a women's clinic and later working at the Anoka County Jail.  (Tr. 286, 277.)  She stopped working at the Anoka County Jail when she felt that she could no longer perform her job duties.  (Tr. 268.)  There is no evidence that a work release was issued at any point after her alleged onset date.

The Court also rejects the Defendant's contention that the October 2000 MRI is inconsistent with Dr. Jacoby's opinion.  To the contrary the October 2000 MRI is fully consistent with Dr. Jacoby's opinion regarding the degenerative nature of Plaintiff's condition.  The Defendant concedes that this objective data shows that Plaintiff's condition had "progressed when compared to the early December 1996 study."  It dismisses the degeneration because the October 2000 MRI showed only "mild posterior disc bulging and marginal spurring."  (Defendant's Memorandum at p.12. n.2). There is nothing about the October 2000 MRI which warrants rejecting the opinion of Plaintiff's long time caregiver.

The ALJ notes that there is some question as to whether Ms. Rowe may have self-limited her activities and that she was unwilling to fully participate in treatment recommendations.  It is difficult to know what activities and treatment the ALJ was referring to, because he provides no further explanation.  The ALJ also found that Ms. Rowe's failure to seek aggressive treatment discredited her claims of disability.  The ALJ, however, does not explain what further treatment Ms. Rowe might have sought.  The record, to the contrary, reveals that Ms. Rowe sought aggressive treatment

whenever it was recommended, as reflected by the fact that she underwent four separate surgeries since the motor vehicle accident in 1996.  There is nothing in the record which indicates that Dr. Jacoby, or any other medical source, recommended or offered an aggressive course of treatment for her complaints of neck, back and shoulder pain.

Based on his rejection of Dr. Jacoby's RFC evaluation, the ALJ chose instead to adopt the evaluation provided by Dr. Hiduchenko who only reviewed the medical records but did not examine or treat the Plaintiff.  For the reasons set forth above, the ALJ erred in not giving Dr. Jacoby's opinion controlling weight.

As the ALJ failed to give the treating physician's opinion the weight it deserved, the Court recommends that the decision of the Commissioner be reversed.

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment [#14] be **GRANTED**;

2.      Defendant's Motion for Summary Judgment [#17] be **DENIED.**


DATED: February 1, 2006               *s/ Franklin L. Noel*
                                       FRANKLIN L. NOEL
                                       United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 21, 2006,** written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.